**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ROBERT C. TAYLOR,

        Plaintiff,

        v.

KAREN G. MILLS,
*Administrator, U.S. Small Business*
*Administration,*

        Defendant.

Civil Case No. 10-1077 (BAH)

Judge Beryl A. Howell

---

**MEMORANDUM OPINION**

The plaintiff Robert Taylor, who is an Area Director for Government Contracting for the Office of Government Contracting ("OGC") at the United States Small Business Administration ("SBA"), brings this action against his current employer Karen G. Mills, Administrator of the SBA, alleging a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The plaintiff claims that the SBA unlawfully retaliated against him for engaging in the legally protected activity of providing testimony in connection with an Equal Employment Office ("EEO") investigation of discrimination claims filed by two of the plaintiff's former SBA subordinates. *See id.* § 2000e-3(a). Specifically, the plaintiff alleges in his single count of retaliation that the SBA falsely lowered his 2008 performance evaluation, denied his requests to hire additional staff, denied his travel requests, denied his request to telecommute on a fixed schedule, and unjustifiably scrutinized and criticized his work performance. Compl. ¶¶ 16, 21–25, ECF No. 1. Pending before the Court is the defendant's Motion for Summary Judgment, and for the reasons set forth below, the Court grants that motion.

## I.     BACKGROUND

### A.     Factual Background

The plaintiff is the Area 5 Director for the OGC at the SBA.  *See* Compl. ¶ 7; Def.'s

Statement of Material Facts ("Def.'s SMF") ¶¶ 43–44, ECF No. 14-1.[1]  The OGC is one of four

offices that comprise the Office of Government Contracting and Business Development

("GCBD") within the SBA.  Def.'s SMF ¶ 11; *see also* Def.'s Mot. Summ J. Ex. EE, ECF No.

14-7.  In turn, the GCBD is one of twenty-six offices that make up the SBA Headquarters.[2]

Within the OGC, a Director of Government Contracting and Deputy Director of

Government Contracting supervise an Assistant Director for Contract Assistance.[3]  *See* Def.'s

SMF ¶ 13; Def.'s Mot. Summ. J. Ex. E at 1, ECF No. 14-3.  The Assistant Director for Contract

Assistance "directly supervises all six Area Directors in the [OGC]," and "[a]rea Directors

supervise employees in offices located in different areas of the country throughout the states in

their specific areas."  Def.'s SMF ¶¶ 18, 112.  In particular, Area 5 covers six states (Texas,

Colorado, New Mexico, Oklahoma, Arkansas, and Louisiana), and the "duty station" for the

Area 5 Director is located at SBA's Fort Worth, Texas District Office.  *Id.* ¶¶ 38–39.

The plaintiff has been employed by the SBA since 1978.  *Id.* ¶ 1.  In September of 2006,

the plaintiff was elevated to his first supervisory position—the Assistant Director for Contract

---

[1] The Plaintiff's Statement of Material Facts in Dispute ("Pl.'s SMF"), ECF No. 17-1, is not formatted in a manner that sets out each fact in a separate, numbered paragraph supported by specific citation to record evidence.  The plaintiff's failure to format his SMF in this way has made it more difficult for the Court to discern which facts are in dispute, particularly because the plaintiff intersperses disputed facts with both undisputed facts and self-serving arguments.  Nevertheless, the Plaintiff's SMF does, in its own way, "set[] forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated" with "references to the parts of the record relied on."  LCvR 7(h).  To the extent the plaintiff's SMF either fails to contest facts stated in the defendant's SMF or, in so contesting, fails to refer to the portion of the record supporting the factual dispute, the Court will "assume that facts identified by the [defendant] in its statement of material facts are admitted."  *Id.*

[2] *See* U.S. Small Bus. Admin., SBA Office List, http://www.sba.gov/about-offices-list/1 (last visited Sept. 24, 2012).

[3] It is unclear from the record what the correct title of this position is.  The defendant refers to the plaintiff's position variably as the "Assistant Director for Contract Assistance," the "Associate Director for Contract Assistance," and the "Assistant Administrator for Contract Assistance."  *Compare* Def.'s SMF ¶¶ 4, 7–10, *with id.* ¶ 13, *with* Mem. P. & A. in Supp. Def.'s Mot. Summ J. ("Def.'s Mem.") at 3, ECF No. 14.  The Court will refer to it by the moniker most often used:  Assistant Director for Contract Assistance.

Assistance, located in the SBA's headquarters in Washington, D.C. *Id.* ¶¶ 6, 9. Hierarchically, as discussed above, the Assistant Director for Contract Assistance reports to the Director and Deputy Director for Government Contracting and directly supervises all six Area Directors in the OGC. *Id.* ¶¶ 13, 18. In 2007, however, the plaintiff decided that he and his family wanted to move to Texas, and so he requested in January 2008 to take the position of Area 5 Director, which his supervisors approved. *Id.* ¶¶ 40–42. With the retirement of the plaintiff's predecessor on February 1, 2008, the plaintiff became the Acting Area 5 Director. On July 6, 2008, the plaintiff officially became the Area 5 Director, and in August 2008, the plaintiff relocated to Texas to assume his new position. *See id.* ¶¶ 40–45, 47.

### 1.   *Butler and McClam EEO Actions*

In the fall of 2007, when the plaintiff was still the Assistant Director for Contract Assistance, he directly supervised two employees named Edith Butler and Pamela McClam. *Id.* ¶ 19; Pl.'s Mem. P. & A. in Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") Ex. 2, at 4, ECF No. 17-8. According to the plaintiff, both women were "outstanding performers whose duties for several years included responsibilities above their GS grade-level." Pl.'s SMF at 2. As a result, the plaintiff attempted to get them promotions through a procedure called "accretion of duties." Def.'s SMF ¶ 20. As its name implies, the "accretion of duties" procedure involves an evaluation of an employee's current duties by the human resources department (called a "desk audit") to determine whether that employee should be able formally to add (*i.e.*, accrete) further duties and be promoted to a higher pay grade in the process. *See* Pl.'s SMF at 2; Def.'s SMF ¶ 21. The SBA Office of Human Capital Management, however, informed the plaintiff that, to accomplish his goal, he should initiate two "recruitment actions" for GS-14 level positions and limit recruitment to only SBA employees. Def.'s SMF ¶ 21. These actions were both cancelled

sometime in the spring of 2008, though the record is unclear exactly when that occurred. *See* Pl.'s Opp'n Exs. 1–2, ECF Nos. 17-8, 17-9.

In May and June of 2008, respectively, both Ms. McClam and Ms. Butler filed administrative EEO complaints against the SBA as a result of the canceled recruitment actions, claiming that they had been passed over for promotions based on their gender, age (over 40), and race (African American). *See id.* The plaintiff was interviewed by EEO counselors in connection with both complaints in May and June 2008 respectively, and he told the EEO that "someone (unknown) in the building, asked to have the announcements pulled," and that "Ms. Butler's promotion was halted due to a change in management in January of 2008." *Id.* Ex.1, at 7; *id.* Ex. 2, at 6. The plaintiff says that when he inquired at SBA Headquarters as to the status of the recruitment actions, he was told that the actions had been canceled by Fay Ott, [4] who at that time was the Associate Administrator for GCBD. *See* Taylor Dep. at 45:18–22, ECF 14-2.[5]

In addition to the informal interviews, the plaintiff also filed sworn affidavits in connection with both EEO administrative complaints. The affidavit for Ms. McClam was filed on August 26, 2008, and the affidavit for Ms. Butler was filed on October 2, 2008 (collectively, the "2008 Affidavits"). Def.'s SMF ¶¶ 26–29. In the affidavit submitted on Ms. Butler's behalf, the plaintiff admitted that "I have no knowledge what [Ms. Ott's] motivations were," but he nevertheless speculated that "this was done because of Ms. Butler's race or color" because Ms. Ott is white and Ms. Butler is black.[6] *See* Def.'s Mot. Summ J. Ex. K at 2–3. The plaintiff did

---

[4] Ms. Ott began working in the GCBD in January 2008. *See* Pl.'s Opp'n Ex. 2, at 6.

[5] The full transcript of the plaintiff's deposition is attached as Exhibit A to the defendant's Motion for Summary Judgment. *See* ECF No. 14-2. Although the plaintiff stated in his deposition that he was "shocked to find that a lady by the name Fay Ott had canceled the recruitment actions" in August 2008, Taylor Dep. at 45:21–22, the record is clear that the plaintiff was aware about the actions being canceled much earlier. The plaintiff was aware that the recruitment actions had been canceled at least as early as May and June 2008 when he was interviewed by the EEO. *See* Pl.'s Opp'n Ex. 1, at 7; *id.* Ex. 2, at 6.

[6] In his earlier affidavit submitted on Ms. McClam's behalf, the plaintiff simply stated, "I do not know with absolute certainty if [Ms. McClam] was subject to discrimination." Def.'s Mot. Summ. J. Ex. J. at 3.

not implicate Karen Hontz, the Director of Government Contracting, in the cancelation of the recruitment actions or any wrongdoing in either affidavit, though he did list her as a potential "witness[]" in one of the affidavits. *Id.* Ex. J. at 4.[7]  In fact, Ms. Hontz was not listed as a "Primary Responding Official" in either EEO complaint.  Rather, in the 2008 Affidavits, the plaintiff stated, "[i]t is my understanding that [the recruitment action for Ms. McClam] was withdrawn by . . . Ms. Fay Ott," Def.'s Mot. Summ. J. Ex. J at 3, and that "[i]t was either Fay Ott or Jovita Carranza" who called back Ms. Butler's recruitment action, *id.* Ex. K at 2.  The plaintiff alleged in his Complaint, however, that "[t]he senior officials at the SBA who are the target of the claims of discrimination against Ms. Butler and Ms. McClam are Karen Hontz and Calvin Jenkins." Compl. ¶ 15.  In his deposition, he again identified Ms. Hontz as the target of the Butler and McClam discrimination claims, explaining that, "knowing how close [Ott and Hontz] are professionally," he was "very confident that Fay Ott and Karen Hontz [canceled the recruitment actions] together."  Taylor Dep. at 59:16–18.

The plaintiff contends that the SBA—and specifically, Ms. Hontz—retaliated against him for filing these affidavits through a series of actions that he argues were "designed to destroy his SBA career" and "cripple his effectiveness as an Area Director."  Pl.'s Opp'n at 10–11, ECF No. 17.  In particular, he claims that Ms. Hontz (1) falsely lowered his 2008 performance evaluation, (2) denied his requests to hire additional staff, (3) denied his requests to travel within his region, (4) denied his request to telecommute on a fixed schedule, and (5) subjected him to unjustified monitoring and criticism of his performance.  *Id.*

## 2.    *Performance Evaluation*

SBA employees are rated each year by one supervisor (the "rating official") on a scale from one to five on a series of "Critical Elements," such as "customer service," "leadership," and

---

[7] The plaintiff alleges in his SMF that the affidavits "suggest[] that Ms. Hontz may also have taken the action," though the affidavits themselves do not support that assertion.  *See* Pl.'s SMF at 20.

"people management and responsibilities," and the evaluation is then reviewed and approved by a second supervisor (the "reviewing official").  *See* Pl.'s Opp'n Ex. FF at 3–4 (listing "Critical Elements"); SBA Standard Operating Procedure 34 30 4 ("SOP 34 30 4") (effective May 15, 2000) at 16–18, *available at* http://archive.sba.gov/sops/3430/sop34304.pdf (describing review procedures).  These "Critical Elements" are averaged for each employee, and that numerical score corresponds with a "summary level" rating.  The summary levels are as follows: "Unacceptable" (less than 2.0), "Minimally Successful" (2.0 to 2.99), "Fully Successful" (3.0 to 3.59), "Exceeds Fully Successful" (3.6 to 4.59), and "Outstanding" (4.6 to 5.0). [8]  SOP 34 30 4, at 17.  More specifically, while an "Exceeds Fully Successful" rating is "[v]ery good performance which deserves special recognition," an "Outstanding" rating is "[p]erformance of excellent quality that is exceptional and usually deserving of a performance award."  *Id.*

Performance awards at the SBA are of three varieties:  (1) Quality Step Increase ("QSI"); (2) Sustained Superior Performance ("SSP"); and (3) Superior Accomplishment ("SA").  *Id.* at 22.  A QSI is an increase in an employee's pay by "one step or rate" of the employee's GS pay grade. [9]  To receive a QSI, an employee must (a) be "paid at less than the maximum step of [his] grade," (b) receive an "Outstanding" rating, (c) be recommended by his rating official; and (d) be approved by an appropriate "approving official," which for a QSI is either a Management Board Member or a District Director.  *Id.* at 22–23, 44.  An SSP and an SA are both "one-time lump sum cash payments."  *Id.* at 22.  An SA requires at least a "Fully Successful" rating, and an SSP requires at least an "Exceeds Fully Successful" rating.  *Id.*

---

[8] The "Outstanding" rating is also referred to as an "Excellent" rating, and the "Exceeds Fully Successful" rating is also referred to as an "Exceeds Expectations" rating.  *See, e.g.*, Def.'s Mot. Summ. J. Ex. FF at 1.  The Court will refer to these pairings of ratings interchangeably.

[9] At all relevant times, the plaintiff was a GS-15 pay grade employee.  *See* Def.'s Mot. Summ. J. Ex. FF, ECF No. 14-7.

The plaintiff received an "Outstanding" rating in four of the six years prior to filing his Complaint (2005–2007 and 2009) and an "Exceeds Fully Successful" rating in the other two years (2008 and 2010).  *See* Def.'s Mot. Summ. J. Ex. EE at 1.  From 2008 to 2010, the plaintiff received an SSP Performance Award each year, ranging from $1,200 to $2,500 per year.  *Id.* at 11, 18; *id.* Ex. FF at 1.[10]  In 2008, the plaintiff initially received an "Outstanding" rating from his rating official, Linda Korbol, but the plaintiff's reviewing official, Ms. Hontz, lowered the plaintiff's rating to an "Exceeds Fully Successful."  *See* Def.'s SMF ¶¶ 168–70; Def.'s Mot. Summ J. Ex. C at 30:20–31:21; *id.* Ex. FF at 1.  Ms. Hontz lowered three of the plaintiff's "Critical Elements" from fives to either threes or fours.  In the comments attached to her evaluation, Ms. Hontz stated, under the "Critical Element" of "People management responsibilities," that the plaintiff's "actions with employees led to EEO complaints filed against upper management"; he "did not approve telecommuting in line with regulations"; some of his employees "did not have proper personal business commitment plans"; and his "ratings for employees did not have sufficient justification."  Def.'s Mot. Summ J. Ex. FF at 2.

The plaintiff was not the only SBA employee whose 2008 performance rating was decreased upon review by Ms. Hontz.  In 2008, Ms. Korbol gave all employees whom she rated an "Outstanding" rating, and Ms. Hontz, as the reviewing official, decreased at least four of those employees' ratings, including the plaintiff's.  *See* Def.'s SMF ¶¶ 169, 171.  Although the plaintiff appealed to Ms. Hontz to reinstate his "Outstanding" rating and later submitted a "Statement of Dispute" to Calvin Jenkins—the Deputy Associate Administrator for the GCBD and Ms. Hontz's direct supervisor—asking that Mr. Jenkins reinstate his "Outstanding" rating, both Ms. Hontz and Mr. Jenkins denied the plaintiff's requests.  *See* Def. Mot. Summ. J. Ex. HH at 2–3, ECF No. 14-8.

---

[10] There is no evidence in the record regarding what performance awards, if any, that the plaintiff received prior to 2008.

On December 19, 2008, the plaintiff appealed Mr. Jenkins's denial of his "Statement of

Dispute" to the SBA's Office of Hearings and Appeals ("OHA").  *See id.*  The presiding

adjudicator of that appeal, Administrative Judge Holleman, concluded on March 20, 2009, that

the SBA had "met its burden of supporting [the plaintiff's] performance rating with substantial

evidence" and found that the plaintiff had failed to demonstrate that he had performed any

activities that "would justify a Level 5 rating."  *Id.* at 6.  Administrative Judge Holleman also

specifically addressed Ms. Hontz's comment in her evaluation about the plaintiff's "actions with

employees le[ading] to EEO complaints [being] filed."  He stated that "the Agency should not

have held against [the plaintiff] the filing of EEO complaints by two unidentified employees"

because "the mere fact that an employee has exercised his or her right to file a complaint . . .

cannot be grounds for criticizing the supervisor or for giving that supervisor a lower evaluation

than he or she would have otherwise received."  *Id.*  Nevertheless, Administrative Judge

Holleman denied the plaintiff's appeal.[11]

### 3.  *Hiring Requests*

The SBA, like many government agencies, has experienced a steady decline in its staff

sizes over the past ten to twenty years due to budget constraints.  Def.'s SMF ¶ 69.  Between

2003 and 2008 in particular, the number of employees working in the Area 5 Office decreased,

leaving Area 5 with the smallest staff of all the Areas.  *Id.* ¶ 71, 74.  By February 2008, when the

plaintiff first became acting Area 5 Director, there were only twelve employees in the Area 5

office, *id.* ¶ 73, and only one employee in the plaintiff's immediate office, Pl.'s SMF at 14.

Because of the staffing shortfalls in Area 5, the plaintiff was "vocal about his desire to

hire more staff," and in February 2009 he emailed his supervisors (David Loines and Charles

---

[11] The plaintiff received the same performance rating in 2010 as he did in 2008 (*i.e.*, "Exceeds Expectations"), *see* Def.'s Mot. Summ. J. Ex. EE at 17—26, though Ms. Hontz was not in the plaintiff's supervisory chain at the time the 2010 performance evaluation was finalized, *see* Taylor Dep. at 160:19–25.  The plaintiff stated in deposition testimony that he does not consider "Exceeds Expectations" to be a bad rating.  *See id.* at 168:11–13.

George),[12] requesting to hire additional staff, *i.e.*, a Deputy Area Director, a Program Assistant, an Industrial Specialist, a Size Specialist, and an administrative assistant.  Def.'s SMF ¶¶ 78, 85, 102.  Indeed, all of the Area Directors submitted staffing requests that were not filled due mainly to budget constraints.  *Id.* ¶¶ 86–92.  Ultimately, the plaintiff was authorized to hire at least five individuals for his Area since becoming Area 5 Director, including four Procurement Center Representatives ("PCRs"), and one Commercial Marketing Representative ("CMR").  *Id.* ¶ 107; *see also* Def.'s Mot. Summ. J. Ex. W.

The plaintiff also requested a desk audit for Stephanie Lewis, a CMR in the Area 5 office, so that she could obtain an accretion of duties promotion to Deputy Area Director.  Def.'s SMF ¶ 140.  The plaintiff's predecessor as Area Director had also tried to obtain the same promotion for Ms. Lewis, but his "requests were never acted upon by headquarters."  *Id.* ¶ 139.  Ms. Hontz denied the plaintiff's request in January 2009, *see* Taylor Dep. at 180:19–181:4, and according to the defendant the denial was due to budget constraints and a diminishing need for supervisory positions because staffing levels had decreased.  *Id.* ¶¶ 131–33.  The plaintiff contends, however, that funds were available for additional staff and that Ms. Hontz denied his request for Ms. Lewis's desk audit (and thus his ability to obtain a GS-14 employee) to retaliate against him.  *See* Pl.'s SMF at 14–15.

### 4.    *Travel Requests*

Because Area Directors supervise employees in offices located throughout their designated region, they sometimes travel to these satellite offices.  *See* Def.'s SMF ¶¶ 112–15.  To do so, Area Directors submit travel requests to their supervisors, who consider the Area Director's budget and review requests on a case-by-case-basis.  *Id.* ¶¶ 109–10, 121.  The plaintiff submitted several travel requests as Area Director, several of which were approved by his

---

[12] At that time, Mr. Loines was the Acting Deputy Director for Government Contracting, and Mr. George was the Acting Assistant Director for Contract Assistance.  Def.'s SMF ¶¶ 14, 16.

supervisors, *see* Def.'s Mot. Summ. J. Ex. Y, but at least one of those requests was denied in the fall of 2008 by Ms. Hontz, *see id.* Ex. Z.  According to the plaintiff, "Ms. Hontz approved [his] travel requests prior to October 2, 2008," *i.e.*, the date the plaintiff submitted his affidavit in Ms. Butler's EEO proceeding.  Pl.'s SMF at 15.

The one denial of a travel request took place in September or October of 2008, after the plaintiff had prepared a travel voucher in the amount of $127.32 for a trip he made to San Antonio on August 11, 2008, the purpose of which was to provide orientation and training to a new employee there.  *Id.* at 15–16.  The defendant states that travel requests like the plaintiff's were regularly denied due to "very strict budget constraints," and that Ms. Hontz herself denied a number of other Area Directors' travel requests in 2008 and 2009.  *See* Def.'s SMF  113–15, 118–20.  The plaintiff, however, claims that Area 5 had "an abundance of travel funds in 2008" and that his "negligible" travel request was dwarfed by the "several thousand dollars" that he claims were available in the Area 5 travel budget.  *See* Pl.'s SMF at 16.

### 5. *Telecommuting Schedule*

The SBA permits eligible employees to telecommute, which allows approved employees to work "one or more days at home or at an approved alternate duty station rather than in the traditional office."  Def.'s Mot. Summ. J. Ex. O at 7, ECF No. 15-1.  A telecommuting employee may either work from home or a "telecenter," which is a government-owned office site near the employee's home.  *Id.* at 10.  Telecommuting schedules are either "pre-determined" (*i.e.*, fixed), where the employee and his supervisor agree on a specific schedule for workdays spent at home, or "intermittent" (*i.e.*, *ad hoc*), where the employee must submit a request to his supervisor each time he wants to telecommute.  *See id.* at 18–19; *see also* Def.'s Mot. Summ. J. Ex. R (*ad hoc* telecommuting "should be preapproved for a specific project [or] need").

Before moving to Texas in August 2008 to take up his position as Area Director, the plaintiff built a house in a suburb of Austin, Texas called Lakeway, which is over 200 miles (approximately 3.5 hours by car) from the Area 5 District Office in Fort Worth.  Def.'s SMF ¶¶ 48, 60–61.  The plaintiff's home is so far from his office, in fact, that his usual practice is to travel to Forth Worth at the beginning of the week, stay in a hotel, and then return to his home at the end of the week.  *Id.* ¶ 63.  On July 3, 2008, the plaintiff submitted a request to Ms. Hontz for a fixed telecommuting schedule.  *See* Def.'s Mot. Summ. J. Ex. P.  Ms. Hontz instead approved an *ad hoc* telecommuting schedule for the plaintiff on July 9, 2008 (effectively denying the request for a fixed schedule) and notified the plaintiff about her decision via e-mail, explaining that "[s]ince Area [5] has been without a resident director for a long time, it is important for you to be in the office or working the region."  *Id.* Ex. R.  At the time, the plaintiff responded that he "concur[red] with her reasoning."  *Id.*  Now, however, the plaintiff disputes the reasoning of Ms. Hontz's denial because "he supervises all but two employees by telephone" and therefore he could just as effectively perform his job from his home.  Pl.'s SMF at 17.  Unable to telecommute on a fixed schedule, the plaintiff has opted to participate in an "alternative work schedule," in which he works nine hour days and has every other Friday off.  Def.'s SMF ¶ 65.

### 6.    *Monitoring and Criticism of Work Performance*

On January 29, 2009, Ms. Hontz sent an e-mail to Mr. Loines, the Acting Deputy Director for Government Contracting and plaintiff's second-level supervisor, asking him to retrieve a copy of Stephanie Lewis's Personal Business Commitment Plan ("PBCP")[13] in response to the requested desk audit of Ms. Lewis.  Def.'s Mot. Summ. J. Ex. CC, ECF No. 14-7.  Ms. Hontz stated that "there is no position available for Deputy," that she was "not going to

---

[13] A PBCP is a document that "serve[s] as [an] individual performance contract" for employees.  *See* U.S. Gov't Accountability Office, GAO 08-995, Small Business Administration:  Opportunities Exist to Build on Leadership's Efforts to Improve Agency Performance and Employee Morale 21 (2008).

approve any back dooring of a position," and that she did "not want [the plaintiff] to create additional personnel problems as he did in the office of contract assistance." *Id.* The next day, Ms. Hontz sent an e-mail to Mr. Loines and Mr. George expressing her frustration with how the plaintiff had handled the assigning of responsibilities to a newly hired employee in his Area. *See id.* Ex. DD. In this e-mail, Ms. Hontz asked Mr. Loines and Mr. George to obtain the PBCP of the plaintiff's entire staff as well as "a list by person of what buying activities and prime contractors and other duties . . . each person is doing." *Id.* According to the plaintiff and Mr. George, no other Area Directors were required to provide this information. Pl.'s SMF at 5; George Dep. at 30:15–21. [14]

After receiving the PBCPs from the plaintiff as requested, Ms. Hontz noted, via e-mail to Mr. Loines and Mr. George on February 2, 2009, several errors in Ms. Lewis's PBCP and asked Mr. Loines and Mr. George to review all of the Area 5 PBCPs for errors. *See* Def.'s Mot. Summ. J. Ex. KK at 1740. In that same e-mail, Ms. Hontz stated that the plaintiff's "work regarding managing staff is unacceptable at the moment." *Id.* Ms. Hontz requested that Mr. Loines and Mr. George have a conversation with the plaintiff regarding her concerns about the plaintiff's personnel management, and Mr. Loines and Mr. George conveyed those concerns to the plaintiff in a conference call on February 4, 2009. *See* Def.'s SMF ¶¶ 162–63.

On February 3, 2009, Ms. Hontz held a meeting with the plaintiff's immediate and second-line supervisors (Mr. George and Mr. Loines, respectively) to discuss Mr. George's new detail to the Assistant Director for Contract Assistance—the plaintiff's former position. Def.'s SMF ¶¶ 147–48. In this meeting, Ms. Hontz and Mr. Loines generally provided Mr. George with an orientation of his responsibilities. George Dep. at 86:2–5. Ms. Hontz also made clear to Mr. George that she wanted him to review the plaintiff's time and attendance, invoices, and travel

---

[14] All cited portions of Mr. George's deposition are included in either Exhibit I to the defendant's Motion for Summary Judgment, ECF No. 14-4, or Exhibit 4 to the plaintiff's opposition, ECF No. 17-4.

vouchers because she did not "want Mr. Taylor to create the same personnel problems in his Area 5 that he did while he was the assistant director in Contract Assistance." *Id.* at 87:3–6, 91:13–16.  Ms. Hontz specifically referenced the EEO complaints that had been filed by Ms. McClam and Ms. Butler in this meeting, telling Mr. George that "Mr. Taylor was responsible for those EEOs." *Id.* at 19:7–11.  Mr. George interpreted Ms. Hontz's comments to equate the referenced "personnel problems" with the EEO complaints filed by Ms. McClam and Ms. Butler. *Id.* at 24:18–22.

Finally, in April 2010 (after the plaintiff filed the instant action), the plaintiff and Ms. Hontz "had an exchange" at a national SBA Government Contracting conference in Washington, D.C.  *See* Def.'s Reply to Pl.'s Statement of Material Facts in Dispute ("Def.'s SMF Reply") ¶ 13, ECF No. 19-1; Pl.'s SMF at 12.  During this "exchange," the plaintiff claims that when he was making a presentation in front of approximately 100 people, Ms. Hontz "suddenly stood up and shouted at [him] to sit down before he had completed his presentation."  Pl.'s SMF at 12–13.

## B.    Procedural History

On May 21, 2009, the plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").[15]  *See* Def.'s Mot. Summ. J., Ex. LL, ECF No. 14-8.  In the EEOC complaint, the plaintiff alleged that the defendant—in retaliation for his participation in other SBA employees' EEO discrimination investigations—lowered his performance evaluation in 2008, denied his right to telecommute, denied his requests to recruit additional staff, denied his requests to travel throughout his Area, and unreasonably criticized his performance.  *See id.* at 3–4.  The plaintiff "received a Final Agency Decision dated April 22, 2010, stating that he had

---

[15] The date listed on the EEOC complaint is May 21, 2009, though the plaintiff lists the filing date as May 22, 2009 in his Complaint.  *Compare* Pl.'s Opp'n Ex. LL at 1, *with* Compl. ¶ 5.  The Court will use the earlier date of May 21, 2009, though this discrepancy has no effect on the disposition of this case.

failed to meet his burden of adducing by a preponderance of the evidence that management

discriminated against him on the basis of retaliation."  Def.'s SMF ¶ 179.

After issuance of the Final Agency Decision, the plaintiff filed a complaint in this Court

on June 25, 2010.  Pending before the Court is the defendant's Motion for Summary Judgment,

ECF No. 14.[16]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is properly

granted against a party who "after adequate time for discovery and upon motion . . . fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a

genuine issue of material fact" in dispute.  *Id.* at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable

inferences in favor of the nonmoving party and shall accept the nonmoving party's evidence as

true.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Estate of Parsons v.*

---

[16] On February 16, 2012, the plaintiff moved for an oral hearing to respond to the "inaccurate manner in which the Defendant sets forth the record" in its Reply.  *See* Request for Hearing, ECF No. 20.  The Court finds that the parties' arguments have been sufficiently laid out in their papers and will therefore deny this motion pursuant to Local Civil Rule 7(f), which states that allowance for an oral hearing "shall be within the discretion of the court."

On March 7, 2012, the plaintiff also filed a Motion to Strike the Defendant's Reply, *see* ECF No. 22, citing the reply brief's failure to adhere to the 25-page limit for reply memoranda of law under Local Civil Rule 7(e) because the defendant attached a 14-page exhibit, ECF No. 19-1, to its 21-page memorandum of law, ECF No. 19.  The page limitation in Local Civil Rule 7(e) clearly refers to the "memorandum" of law and does not encompass attached exhibits.  It is for this precise reason that the plaintiff did not run afoul of the 45-page limit in LCvR 7(e) when he filed his opposition to the defendant's motion for summary judgment by filing both a 24-page memorandum of law and over 300 pages of attached exhibits.  *See* ECF Nos. 17, 17-2 to 17-29.  Accordingly, because the defendant's submission of a "Reply to the Plaintiff's Statement of Material Facts in Dispute" as an exhibit to the reply memorandum of law did not count toward the 25-page limit under LCvR 7(e), the Court will also deny the plaintiff's motion to strike.

*Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  The Court is only required to consider

the materials explicitly cited by the parties, but may on its own accord consider "other materials

in the record."  FED. R. CIV. P. 56(c)(3).  For a factual dispute to be "genuine," the nonmoving

party must establish more than "the mere existence of a scintilla of evidence" in support of its

position, *Liberty Lobby*, 477 U.S. at 252, and cannot simply rely on "mere allegations" or

conclusory statements, *see Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v.

Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993);

*accord* FED. R. CIV. P. 56(e).  Rather, the nonmoving party must present specific facts that would

enable a reasonable jury to find in its favor.  *See, e.g.*, FED. R. CIV. P. 56(c)(1).  If the evidence

"is merely colorable, or is not significantly probative, summary judgment may be granted."

*Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).  "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to

judgment as a matter of law' because the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof."

*Id.*  "Self-serving testimony does not create genuine issues of material fact, especially where that

very testimony suggests that corroborating evidence should be readily available."  *Fields v.

Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007).

## III.   DISCUSSION

The plaintiff alleges in his single count of retaliation that the SBA "improperly subjected

him to false evaluations," and "unjustified and abusive criticism of his performance," denied him

the "conditions and terms of employment necessary to perform his position," all in violation of

the retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a).  Compl. ¶¶ 22–23.  More

specifically, the plaintiff claims that the SBA or its agents subjected him to a punitive "fishing

expedition," falsely lowered his performance evaluation in 2008, denied his requests to hire additional staff, denied his requests to travel within his region, denied his requests to telecommute on a fixed schedule, and humiliated him in front of his colleagues.  *See* Pl.'s Opp'n at 10–13.  The plaintiff claims that all of these actions were designed to punish him for engaging in protected activity, "to destroy his SBA career," and to "harass" him.  *Id.* at 10, 14, 16–17.

The defendant has moved for summary judgment on the grounds that (i) the plaintiff failed to timely exhaust his telecommuting claim, (ii) none of the other alleged employment actions constitute "materially adverse actions" sufficient to state a claim for retaliation, (iii) there is no causal connection between the plaintiff's protected activity and the alleged retaliatory actions, and (iv) there is no evidence of retaliatory motive or intent to suggest that the defendant's legitimate, non-discriminatory reasons for taking the allegedly adverse actions were pretext for discrimination.  *See* Mem. P. & A. in Supp. Def.'s Mot. Summ J. ("Def.'s Mem.") at 2, ECF No. 14.  For the reasons discussed below, the Court concludes that (1) the plaintiff has failed to plead a hostile work environment claim, (2) the plaintiff failed administratively to exhaust his claim regarding his telecommuting request in a timely fashion and (3) none of the remaining employment actions constitute adverse employment actions as a matter of law.

## A.    The Plaintiff Has Not Constructively Amended His Complaint to Include a Hostile Work Environment Claim

At the outset, the Court must address one issue of scope.  Although the only claim included in the plaintiff's Complaint is one for retaliation, the plaintiff also appears to raise a claim for a hostile work environment in his opposition brief by citing the legal standard for a hostile work environment claim, *see* Pl.'s Opp'n at 9–10 (citing, *inter alia*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), and, in the same section of his brief, characterizing the defendant's actions as "a full-scale attack on him personally" that involved "frequent, pervasive, intimidating, insulting, [and] humiliating" conduct, *see id.* at 10.

16

To the extent the plaintiff is arguing that he pleaded a hostile work environment claim in his Complaint, that argument is not supported by the face of his allegations.  The Complaint was clearly captioned as one count of "Retaliation," and that single count even specifically cites the anti-retaliation provision of Title VII as the relevant law that was violated by the defendant's actions.  *See* Compl. at 6–7 & ¶ 23.  Furthermore, although the Complaint mentions in passing that the defendant "harassed" him and that certain actions were "abusive," "humiliat[ing]," and "embarrass[ing]," *see id.* ¶¶ 22, 25, the Complaint uses neither the word "hostile" nor the word "environment" to describe his claim.  The latter word ("environment") is particularly important to describing a hostile work environment claim because, as the plaintiff himself points out, "a hostile work environment claim is different in kind from a claim involving discrete acts of retaliation" because a hostile work *environment* is an ongoing, ambient form of discrimination that is categorically distinct from *discrete* actions of discrimination, retaliatory or otherwise.  *See* Pl.'s Opp'n at 10 (citing *Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir. 2007)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile work environment claims are different in kind from discrete acts."); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 n.1 (9th Cir. 1998) (noting that "a hostile work environment is ambient and persistent").  Therefore, even liberally construing the plaintiff's allegations, the Court concludes that the plaintiff has not pleaded a separate hostile work environment claim in his Complaint.

Furthermore, to the extent the plaintiff's references to a hostile work environment claim in his opposition to the defendant's motion for summary judgment reflect an effort to constructively amend his Complaint, that effort fails.  In the main, a plaintiff is not permitted to raise new claims at the summary judgment stage, where those claims were not pleaded in the complaint.  *See Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their amended complaint.");

*Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) ("[P]laintiff may

not, through summary judgment briefs, raise the new claims . . . because plaintiff did not raise

them in his complaint, and did not file an amended complaint."). Federal Rule of Civil

Procedure 15(b)(2) permits "an issue not raised by the pleadings" to be "treated in all respects as

if raised in the pleadings" when the issue "is tried by the parties' express or implied consent."

FED R. CIV. P. 15(b)(2). While the plain terms of this Rule apply to constructive amendments of

pleadings at trial, at least one Judge within this Circuit has construed this Rule to apply in the

context of a motion for summary judgment, holding that a plaintiff may "constructively amend"

his or her complaint at the summary judgment stage "when the parties ha[ve] fully briefed an

issue that was not necessarily raised in the complaint." *See Turner v. Shinseki*, 824 F. Supp. 2d

99, 122 n.23 (D.D.C. 2011) (citing FED. R. CIV. P. 15(b)(2)). The Court concludes that, even

assuming constructive amendments to pleadings are permitted in this Circuit at the summary

judgment stage under Rule 15(b),[17] the plaintiff has not successfully made such an amendment.

Although the defendant did respond to the plaintiff's eleventh hour insertion of a purported

hostile work environment claim, *see* Def.'s Reply in Supp. of Def.'s Mot. Summ. J. ("Def.'s

Reply") at 7–8, ECF No. 19, that response was cursory and always based on the premise that

"Plaintiff did not plead a hostile work environment claim," *see* Def.'s Reply at 3. When a party

responds to an attempt to constructively amend a complaint at the summary judgment stage like

---

[17] The Court of Appeals for the District of Columbia Circuit has held that a defendant may not "constructively
amend" an answer by adding affirmative defenses at the summary judgment stage. *See Harris v. Secretary, U.S.
Dep't of Veterans Affairs*, 126 F.3d 339, 343–45 (D.C. Cir. 1997) ("Rule 8(c) means what it says: a party must first
raise its affirmative defense in a responsive pleading before it can raise them in a dispositive motion."). In *Harris*,
the D.C. Circuit emphasized that the fairest and most proper way for parties to add new claims or defenses is by
formally amending their pleadings and that Rule 15(b) "does not apply" at the summary judgment stage "[b]ecause a
case decided on motion for summary judgment does not reach trial." *Id.* at 343–45 & n.3. Subsequently, the D.C.
Circuit recognized that "[i]t is an open question whether the Federal Rules permit parties to impliedly consent to
'try' issues not raised in their pleadings through summary judgment motions." *See Indep. Petroleum Ass'n of Am. v.
Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001) (comparing *Harris* with *Kulkarni v. Alexander*, 662 F.2d 758, 762 (D.C.
Cir. 1978)).

the defendant did here, that response is essentially made under protest and does not rise to level of "implied[ly] consent[ing]" to the hostile work environment claim being tried.

**B.**      **Plaintiff Failed to File a Timely EEO Complaint Related to the Denial of His Request for a Fixed Telecommuting Schedule**

The defendant argues that, to the extent that the plaintiff's claim is premised on the denial of his request to telecommute on a fixed schedule, the plaintiff failed to exhaust his administrative remedies for that claim in a timely fashion. *See* Def.'s Mem. at 18-19. Indeed, any federal employee who believes that she has been the subject of unlawful discrimination "must 'initiate contact' with an EEO Counselor in her agency 'within 45 days of the date of the matter alleged to be discriminatory.'" *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) (quoting 29 C.F.R. § 1614.105(a)(1)). "[A] court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling." *Id.* This requirement of timely administrative exhaustion applies to each discrete act alleged to be discriminatory, such that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act.'" *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (quoting *Morgan*, 536 U.S. at 113).

In this case, the plaintiff applied for the fixed telecommuting schedule on July 3, 2008, and Ms. Hontz effectively denied that request on July 9, 2008 by approving a different, *ad hoc* telecommuting schedule. *See* Def.'s SMF ¶ 57; Def.'s Mot. Summ J. Ex. P at 1574. Although the plaintiff was away on vacation at the time of this denial, Ms. Hontz informed the plaintiff, via e-mail on August 19, 2008, that an *ad hoc* telecommuting schedule had been approved. *See* Def.'s Mot. Summ. J. Ex. R. On August 20, 2008, the plaintiff responded by email to Ms. Hontz and wrote, "Thank you for the action on my request. I concur with your reasoning." *Id.* Thus, the plaintiff was clearly aware of this action no later than August 20, 2008, yet he did not initiate

contact with an EEO counselor until March 23, 2009, over seven months later. [18]  *See* Compl.

¶ 5; Def.'s SMF ¶ 176.  As a result, it is clear that the denial of the plaintiff's request for a fixed

telecommuting schedule was not administratively exhausted in a timely fashion.

The plaintiff argues that, nevertheless, his claim as it relates to the telecommuting request

is "properly before the Court" because (a) he raised the telecommuting denial in his May 21,

2009 EEOC complaint and (b) the defendant "never asserted any objection to litigating the

issue." Pl.'s Opp'n at 3–5. [19]  Neither of these arguments, however, addresses the fact that the

plaintiff failed to contact the EEO regarding the denial of his request for a fixed telecommuting

schedule within 45 days.  The discrete act—the denial—was not administratively exhausted in a

timely fashion, and therefore it cannot form the basis of the plaintiff's otherwise procedurally

sound retaliation cause of action, regardless of whether it was referenced in the EEOC complaint

or the Complaint in the instant action.  *See, e.g., Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C.

Cir. 2011) (holding that "discrete discriminatory acts . . . are not actionable if time barred, even

when they are related to acts alleged in timely filed charges") (internal quotation marks omitted).

---

[18] The plaintiff intimates that he might be entitled to equitable tolling of the time period to make contact with the EEO under 29 C.F.R. § 1614.105(a)(2) because "he did not realize until February 2009 of [Ms. Hontz's] motive to retaliate against him." Pl.'s Opp'n at 21.  Even had the plaintiff explicitly presented this revelation as a basis for equitable tolling, it would not cure his failure to exhaust his administrative remedies in a timely fashion.  Equitable tolling only applies where the employee (1) "was not notified of the time limits and was not otherwise aware of them," (2) "did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred," or (3) "despite due diligence [the employee] was prevented by circumstances beyond his or her control from contacting the counselor within the time limits." 29 C.F.R. § 1614.105(a)(2) (2012).  In this Circuit, "[t]he time may in some circumstances be tolled . . . even when a plaintiff was aware of the adverse action in question but not yet aware of the discriminatory motive behind it." *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 60 (D.D.C. 2011) (citing *Miller v. Hersman*, 594 F.3d 8, 12 (D.C. Cir. 2010).  Even so, the plaintiff admitted in his deposition that he "immediately assumed that the reason for the [February 4, 2009] conference call [with Mr. George and Mr. Loines] was retaliation." Taylor Dep. at 178:6–181:23.  Therefore, the undisputed evidence demonstrates that, at the very latest, the plaintiff should have been aware of the possibility of retaliatory animus no later than February 4, 2009, yet he admits that he did not make contact with the EEO until March 23, 2009—47 days later. *See* Compl. ¶ 5.  Therefore, even giving the plaintiff every benefit of the doubt, any argument he may have for equitable tolling would not cure his failure to exhaust his administrative remedies in a timely fashion with respect to the denial of his request for a fixed telecommuting schedule.

[19] The plaintiff does not make any argument that he is entitled to an equitable tolling of the administrative time limits that would excuse his failure to exhaust his administrative remedies in a timely fashion.

**C.**   **The Plaintiff Has Failed to Create a Genuine Issue of Material Fact Regarding Whether Any of the Defendant's Actions Were Materially Adverse**

"Title VII's anti-retaliation provision makes it unlawful for an employer 'to discriminate against [an] employee . . . because he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding." *Steele*, 535 F.3d at 695 (quoting 42 U.S.C. § 2000e-3(a)).  The Court assesses Title VII retaliation claims under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).  First, the plaintiff must prove a *prima facie* case of retaliation: "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (internal quotation marks omitted).  If the *prima facie* case is made, the "burden shifts to the defendant to prove that 'the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" *Youssef v. FBI*, 687 F.3d 397, 402 (D.C. Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

"[O]nce the employer asserts a legitimate, non-discriminatory reason," however, "the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 510); *see also U.S Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.").  Thus, where a defendant has asserted a legitimate, non-discriminatory reason for an adverse employment action, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady*, 520 F.3d at 494.  In that situation, the sole remaining question becomes

21

"'retaliation *vel non*'—whether, based on all the evidence, a reasonable jury could conclude that [the defendant's] proffered reason for the [adverse employment action] was pretext for retaliation." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010).

Nevertheless, even when a defendant has presented a legitimate, non-discriminatory reason for an employment action, the Court must still "analyze first whether the [action taken] was a sufficiently adverse action to support a claim under Title VII." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008). In this sense, "the strength of plaintiff's *prima facie* case remains a relevant consideration," *Kelly v. Mills*, 677 F. Supp. 2d 206, 221 (D.D.C. 2010), and "the Court still first must determine whether plaintiff has suffered an adverse employment action not because that question is part of the prima facie inquiry, but rather because Title VII does not proscribe behaviors that are not materially adverse employment actions," *Adewole v. PSI Servs., Inc.*, 798 F. Supp. 2d 57, 62 (D.D.C. 2011) (internal quotation marks omitted); *see also McGrath v. Clinton*, 666 F.3d 1377, 1380 n.3 (D.C. Cir. 2012) ("Although these [three elements of retaliation] are often described as the elements that a plaintiff must show to establish a 'prima facie' case of retaliation, they are also the elements that a plaintiff must ultimately prove in order to win his case." (citation omitted)); *Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009) ("The court can resolve [the question of retaliation *vel non*] in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case—here that her employer took a materially adverse action against her."). Therefore, the Court will first discuss whether the plaintiff has suffered an adverse employment action for purposes of his retaliation claim.

Title VII's anti-retaliation provision "sweeps more broadly" than its substantive anti-discrimination provision. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *see also Baird*, 662 F.3d at 1250 (noting that "the concept of adverse action is somewhat broader" in

retaliation claims); *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) ("'Adverse

actions' in the retaliation context encompass a broader sweep of actions than those in a pure

discrimination claim."). "[T]he antiretaliation provision, unlike the substantive provision, is not

limited to discriminatory actions that affect the terms and conditions of employment."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). This is because "[a]n

employer can effectively retaliate against an employee by taking actions not directly related to

his employment or by causing him harm *outside* the workplace." *Id.* at 63. Instead, the anti-

retaliation provision "prohibits any employer action that 'well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination.'" *Thompson v. N. Am. Stainless,*

*LP*, 131 S. Ct. 863, 868 (2011) (quoting *Burlington Northern*, 548 U.S. at 68).

In determining what qualifies as an adverse employment action under Title VII's anti-

retaliation provision, the Supreme Court has provided two important guiding principles that are

at times in tension with one another. On the one hand, the Court has made clear that "[t]he

antiretaliation provision protects an individual not from all retaliation, but from retaliation that

produces an injury or harm." *Burlington Northern*, 548 U.S at 67. In this vein, the Court has

said that it "speak[s] of *material* adversity" because "it is important to separate significant from

trivial harms." *Id.* at 68. Thus, "petty slights, minor annoyances, and simple lack of good

manners" cannot qualify as materially adverse actions. *Id.* The Court also has similarly

emphasized that the standard of material adversity refers to "reactions of a *reasonable*

employee" because "the provision's standard for judging harm must be objective" in order to

"avoid[] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a

plaintiff's unusual subjective feelings." *Id.* at 68–69. On the other hand, the Supreme Court has

also said that "[g]iven the broad statutory text and the variety of workplace contexts in which

retaliation may occur, Title VII's antiretaliation provision is simply not reducible to a

comprehensive set of clear rules." *Thompson*, 131 S. Ct. at 868.  Thus, the Court has "phrase[d]

the standard in general terms because the significance of any given act of retaliation will often

depend upon the particular circumstances.  Context matters." *Burlington Northern*, 548 U.S. at

69.  In other words, "an act that would be immaterial in some situations is material in others."

*Id.* (internal quotation marks omitted).

### 1.   *Performance Rating Decrease*

The plaintiff first argues that Ms. Hontz's lowering of his 2008 performance evaluation

from an "Extraordinary" to an "Exceeds Expectations" was an adverse employment action

because it caused the plaintiff to lose the opportunity for a pay increase (*i.e.*, a QSI).  *See* Pl.'s

Opp'n at 12.  "Performance evaluations are likely to be interlocutory or mediate decisions having

no immediate effect upon employment" and therefore "[t]he result of an evaluation is often

speculative, making it difficult to remedy." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir.

2001) (internal quotation marks omitted).  To constitute a materially adverse action under the

*Burlington Northern* standard, a performance evaluation must normally affect tangible job

opportunities or benefits.  *See Taylor*, 571 F.3d at 1321 ("In order for a performance evaluation

to be materially adverse, it must affect the employee's 'position, grade level, salary, or

promotion opportunities.'" (quoting *Baloch*, 550 F.3d at 1199)); *Weber v. Battista*, 494 F.3d 179,

185 (D.C. Cir. 2007) (lower performance evaluations "do qualify as adverse actions insofar as

they resulted in [the plaintiff] losing a financial award or an award of leave").  In particular,

"performance reviews typically constitute adverse actions only when attached to financial

harms." *Baloch*, 550 F.3d at 1199.

The defendant contends that the plaintiff's lowered rating in 2008 was not an adverse

action because it was "not tied to any tangible negative consequences." Def.'s Mem. at 23

(internal quotation marks omitted).  Thus, the relevant question becomes whether there was a

sufficient causal nexus between the 2008 lowered performance evaluation and a tangible financial harm (or a genuine issue of fact regarding such a nexus), such that the evaluation constituted an adverse action. *See, e.g.*, *Taylor*, 571 F.3d at 1321 (plaintiff must "show the evaluations were 'attached to financial harms'" (quoting *Baloch*, 550 F.3d at 1199)). The plaintiff's only evidence to support his assertion that he "lost the opportunity for a [QSI] in 2008" is his own deposition testimony and his own interrogatory response. *See* Pl.'s SMF at 19. These sort of self-serving and otherwise unsupported assertions are typically not sufficient to create a genuine issue of material fact. *See, e.g.*, *Veitch*, 471 F.3d at 134; *Fields*, 520 F. Supp. 2d at 105.

The plaintiff also implicitly relies, however, upon the SBA's policies, which illuminate the potential connection between performance evaluations and QSIs. According to those policies, as discussed above, an "Outstanding" or "Excellent" performance evaluation (the highest possible rating) is but one of four events or conditions that must occur before an SBA employee may receive a QSI. *See* discussion *supra* page 6. Yet, the plaintiff has presented no evidence regarding the other three requirements for a QSI: (1) being paid at less than the maximum step of his pay grade; (2) being recommended for a QSI by his rating official; and (3) being approved for a QSI by an approving official. *See* Small Bus. Admin. SOP 34 30 4, at 22–23.[20] The record also indicates that, although the plaintiff received "Outstanding" ratings in four of the six years prior to bringing this action, the plaintiff has presented no evidence, beyond his own clouded recollection, that he ever actually received a QSI in any of those years. His only purported evidence to that effect is his own deposition testimony, in which he stated that he "think[s]" he received a QSI "one year," though he acknowledged, "I don't know which year."

---

[20] In fact, the only evidence on this point in the record suggests that these requirements were unlikely to be met. Most notably, Ms. Hontz's decision to lower the plaintiff's rating was affirmed not once but *twice* by more senior SBA authorities.

Taylor Dep. at 166:14–15.  To find a causal relationship between lowered performance evaluations and the loss of a financial benefit (and thus to find that the lowered evaluation was an adverse action), a stronger and clearer connection between the two is typically required.  *See Weber*, 494 F.3d at 185 (finding adverse action where employer gave employee financial award in each of the three years before complaining of discrimination, but not in the year after); *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) (finding adverse action where plaintiff received cash award "nearly every year" before negative performance evaluation).  Furthermore, the 2008 performance evaluation itself indicates that the "Recommendation for Performance Award" was *always* listed as a "Sustained Superior Performance" bonus, not a QSI, and it does not appear that Ms. Hontz ever revised that award in her capacity as the reviewing official. [21]  *See* Def.'s Mot. Summ. J. Ex. FF at 1.  Finally, the record demonstrates that the very next year after the lowered performance evaluation (2009), the plaintiff received an "Outstanding" rating and did not receive a QSI; indeed, he received the exact same type of performance award that he received in 2008:  a "Sustained Superior Performance" bonus.  *See* Def.'s Mot. Summ. J. Ex. EE at 11.

In short, although the plaintiff says that he "expected" a QSI in 2008, Pl.'s Opp'n at 19, he has failed to put forth any evidence whatsoever that his subjective expectations were grounded in objective reality.  It is certainly true that, without the "Outstanding" rating, the plaintiff was not eligible for a QSI, but the record is also devoid of evidence to support the notion that, had the plaintiff kept his "Outstanding" rating, he would have received a QSI. *Weber*, 494 F.3d at 185 (performance evaluations are adverse actions when they have a "causal

---

[21] The SBA's relevant SOP indicates that it is the rating official's responsibility to "[r]ecommend appropriate recognition for his/her employees whose performance against standards warrants recognition," SOP 34 30 3, at 7, and to initiate the procedure for recommending performance awards, *id.* at 22–23.  These policies demonstrate that it was almost certainly the plaintiff's rating official (Ms. Korbol), not his reviewing official (Ms. Hontz), who recommended an SSP bonus, rather than a QSI, on the plaintiff's 2008 performance evaluation.  The plaintiff has presented no evidence to contest that this was the case.

relationship" to tangible financial harm); *see also Bridgeforth v. Salazar*, 831 F. Supp. 2d 132,

143 (D.D.C. 2011) (holding that "failure to award or commend plaintiff for his job performance

to his own satisfaction" was not materially adverse where "[m]ere eligibility to be nominated for

discretionary time off and monetary awards did not entitle plaintiff to such benefits as a matter of

course"), *aff'd*, No. 12-5015, 2012 WL 2371601 (D.C. Cir. June 15, 2012).[22]  Indeed, the

uncontested fact that (1) the plaintiff's performance award was consistently listed as an SSP

bonus, not a QSI, even before his rating was lowered; and that (2) the plaintiff continued to

receive an SSP bonus, not a QSI, when he received an "Outstanding" rating the following year,

demonstrate that the "Outstanding" rating has no demonstrable nexus to the award of a QSI,

other than merely to make an employee eligible for a QSI.  As a result, the plaintiff has failed to

create a genuine issue of material fact with regard to whether his 2008 performance evaluation

constituted an adverse employment action, and he has therefore failed to "discharge [his] burden

to show the evaluations were 'attached to financial harms.'"  *Taylor*, 571 F.3d at 1321.

### 2.      *Hiring and Travel Requests*

The plaintiff next contends that, as a result of the denials of his travel and hiring requests,

he was "crippled in his ability to obtain from SBA necessary resources and other requirements to

perform his duties."  *See* Pl.'s Opp'n at 12.  In particular, the plaintiff argues that the following

constituted materially adverse employment actions:  (1) "repeated denied requests to increase

[the plaintiff's] staff positions," (2) "denying Ms. Lewis's desk audit," (3) and "denying [the

plaintiff] the right [to] travel to his satellite offices."  *Id.* at 11.  The defendant does not contest

---

[22] One portion of the *Weber* opinion could be read to suggest that the only required nexus between performance evaluations and performance awards is that an employer "g[ives] performance awards *upon the basis of* each [of] the employee's rating of record in his or her annual performance evaluation."  *Weber*, 494 F.3d at 185 (emphasis added).  The D.C. Circuit has clarified, however, that *Weber* stands for the proposition that, in order for a lowered performance evaluation to constitute an adverse action, it must "*affect* [the employee's] position, grade level, salary, or promotion opportunities."  *Baloch*, 550 F.3d at 1199 (emphasis added); *see also Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009) (holding that "the effect of a poor evaluation is ordinarily too speculative to be actionable," unless "that evaluation *determines* the bonus" (emphasis added) (citing *Weber*, 494 F.3d at 184–85)).

that any of these events took place but rather argues that none of them amounts to a materially

adverse action.  *See* Def.'s Mem. at 21–22.

Heeding the Supreme Court's instruction, the Court will consider the particular context of

the plaintiff's situation in order to determine whether any of these actions "might have dissuaded

a reasonable worker from making or supporting a charge of discrimination."  *Burlington*

*Northern*, 548 U.S. at 68 (internal quotation marks omitted).  The plaintiff is a manager in a

division of the government that had been slowly but surely shrinking in size for several years

prior to the plaintiff assuming his current position.  The plaintiff's predecessor, Noel Martin,

testified that noticeable budget constraints began taking effect in Area 5 as early as 1998, and as

a result his staff began to diminish in size, he was unable to hire an administrative assistant, and

less money became available for things like travel.  *See* Def.'s Mot. Summ. J. Ex. M. at 32:1–4,

36:14–38:12, 39:10–24.  Interestingly, Mr. Martin testified that the plaintiff himself denied

several requests by Mr. Martin to hire additional staff, for budgetary reasons, while he was Mr.

Martin's supervisor.  *See id.* at 37:11–38:12.  Other Area Directors also testified that their

requests for hiring staff and travel were routinely, though not categorically, denied for budgetary

reasons during the relevant time period.  *See* Def.'s Mot. Summ. J. Ex. JJ at 58:1–59:14; *id.* Ex.

Q at 87:6–17, 88:24–89:18, 90:23–91:09, 94:4–95:6.  Finally, the plaintiff himself admitted that

the reduction in staffing was due to budget constraints and that he was aware that budget

constraints were always relevant with respect to travel requests.  *See* Taylor Dep. at 55:23–56:8,

131:23–132:9, 133:4–21, 135:15–136:6.  Thus, the undisputed evidence demonstrates that

budget constraints commonly resulted in denials of requests for resources like staff and travel at

the SBA.

The plaintiff also argues that, as a result of being denied additional staff, he was "forced

to work [1,496.25] hours in excess [of] normal hours required for other area directors for

Government Contracting field offices" over the course of 32 months.  Pl.'s Opp'n at 12.  The

plaintiff, however, once again offers no evidence to support this argument other than the bare,

conclusory allegations in his deposition and in his interrogatory responses.  *See id.*  For such a

specific claim, there is a conspicuous absence of supporting documentation or corroborating

testimony that would substantiate the plaintiff's claim to being forced to work in "excess [of]

normal hours."  Rather, in his deposition, he states that he simply calculated this figure on his

own, based on the fact that he typically "work[s] an 11-hour day," even though he says that Area

Directors are only "required to work a nine-hour day."  *See* Taylor Dep. at 191:8–24.  Another

Area Director, James Gambardella, testified, however, that he generally works 13-hour days,

from 5:30 AM to 6:30 PM, and that all Area Directors found that it "was challenging and

difficult to do the tasks that we were given to do with the limited resources that we had at our

discretion."  Def.'s Mot. Summ J. Ex. Q at 94:6–95:6.  Thus, because the plaintiff's self-serving

and unsupported assertions are insufficient to create a genuine issue of material fact, the plaintiff

has therefore created no such genuine issue with respect to whether the plaintiff was forced to

work beyond the hours generally imposed on all Area Directors, due to budget constraints.

　　　The D.C. Circuit has acknowledged that, in certain factual circumstances, "[a] reasonable

employee might well be dissuaded from filing an EEO complaint if she thought her employer

would retaliate by burying her in work."  *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C.

Cir. 2010) (finding adverse employment action where supervisor "increased [the plaintiff's]

workload to five to six times that of other employees").  Yet, whether an increased workload can

qualify as an adverse employment action must always depend upon the particular factual

circumstances of the workplace at issue.  Indeed, "increased workloads and scarce resources are

to be expected in any workplace," and therefore "[t]he denial of requests for additional support

cannot be the basis for a retaliation claim" where a workplace is generally strapped for resources.

*Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 76–77 (D.D.C. 2007); *see also Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 282 (D.D.C. 2011) (finding no adverse action where employee claimed "that he was deprived of a reasonable number of [supporting staff] compared to other employees and that he was over-worked"); *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C 2001) ("It is not out of the ordinary for employees to have been expected to shoulder an extra load on occasion over a two-year span, or to have been asked to step in if there were unexpected staff shortages.").

In the particular circumstances of this case, the Court finds that the undisputed evidence cannot establish an adverse employment action with respect to the denials of hiring and travel requests.  The record demonstrates that, due to budget constraints, denials like the ones complained of by the plaintiff were commonplace at the SBA, and in fact the plaintiff himself denied many similar requests while serving as the Assistant Director for Contract Assistance. Holding that such denials "might have dissuaded a reasonable [SBA] worker from making or supporting a charge of discrimination" would "give every overworked [SBA] employee in an understaffed office fodder for a Title VII claim."  *Rattigan*, 503 F. Supp. 2d at 76.  Hence, in the context of the plaintiff's employment, the cited denials of hiring and travel requests were "minor annoyances that often take place at work and that all [SBA] employees experience[d]," and therefore they cannot provide the basis for the plaintiff's retaliation claim.  *See Burlington Northern*, 548 U.S. at 68.

Even if denying the plaintiff's requests for staffing and travel could be considered adverse employment actions, those actions would still not constitute retaliation *vel non* under the circumstances presented here.  The plaintiff has presented no evidence that would rebut the defendant's legitimate, non-discriminatory reasons for denying these requests.  The defendant has offered copious evidentiary support for its argument that the plaintiff's requests for travel

and additional staffing were denied for budgetary reasons.  *See, e.g.*, Def.'s Mot. Summ. J. Ex. A at 110:13–22; *id.* Ex. Q at 87:6–17, 98:16–21; *id.* Ex. T; *id.* Ex. JJ at 55:8–59:14.  In response, the plaintiff points to two pieces of evidence.  First, he points to a single line in Ms. Hontz's written comments accompanying the plaintiff's 2008 performance evaluation that said, "[the plaintiff's] actions with employees led to EEO complaints filed against upper management."  *Id.* Ex. FF at 2.  Second, he points to the deposition testimony of Charles George, in which he stated that Ms. Hontz told him about the EEO complaints filed by Ms. McClam and Ms. Butler and that, "'Those two EEOs down there were caused by Mr. Taylor.'"  *See* George Dep. at 19:7–20:5.

This evidence, however, is insufficient to establish retaliation *vel non* for a number of reasons.  First, these comments by Ms. Hontz do not criticize the plaintiff for *supporting* or *participating in* protected EEO activity, but rather they criticize him for *causing* the EEO complaints in the first place by "seek[ing] accretion-of-duties promotions for Ms. Butler and Ms. McClam which were not supported by the Office of Human Capital Management."  Def.'s Reply at 12.  In other words, Ms. Hontz's comments were critical of the plaintiff's actions as a manager, not of his support for the EEO process.  Second, this evidence fails to create a genuine issue of fact regarding whether Ms. Hontz had a retaliatory motive because Ms. Hontz was not implicated in either of the EEO complaints that the plaintiff supported, and thus she would have no apparent reason to retaliate against the plaintiff for supporting the EEO complaints.  *See, e.g.*, *Vickers*, 493 F.3d at 195–96 (no retaliation where supervisor who fired the plaintiff did not "participate in any of the alleged incidents that ma[d]e up [the plaintiff's] hostile work environment claim"); *Short v. Chertoff*, 555 F. Supp. 2d 166, 174 (D.D.C. 2008) (holding that plaintiff failed to rebut non-discriminatory reason where plaintiff's evidence "show[ed] awareness [of protected activity] but not involvement or motive").  The only retaliatory motive

proffered by the plaintiff is the uncorroborated assertion that Ms. Hontz and Ms. Ott (the manager implicated in the EEO complaints) were friends.  *See* Taylor Dep. at 63:6–11.  Finally, the plaintiff's evidence does not create a genuine issue of fact about whether the defendant's stated reasons for denying the plaintiff's requests for staffing and travel (*i.e.*, budget constraints) were false or whether other, similarly situated employees were treated more favorably than the plaintiff.  *See, e.g.*, *Brady*, 520 F.3d at 495.

### 3.      *Monitoring and Criticism of the Plaintiff's Performance*

The plaintiff argues that Ms. Hontz requested information from him, although not from other Area Directors; criticized his performance; and caused "damage to [the plaintiff's] reputation, humiliation, and embarrassment" due to an incident that occurred at an SBA conference.  *See* Pl.'s Opp'n at 10–12.  There are no genuine disputes of material fact regarding the nature of these actions, and none of them rises to the level of an adverse employment action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted).

First, the requests for information from the plaintiff are clearly not adverse employment actions.  Even if Ms. Hontz did not request such information from other Area Directors, requests for business records that are reasonably related to evaluating and critiquing an employee's job performance, and which are not unduly burdensome or harassing, do not constitute adverse employment actions.  *See, e.g.*, *Kline v. Springer*, 602 F. Supp. 2d 234, 242 (D.D.C. 2009) (audit of plaintiff's time records not adverse employment action); *cf. Gard v. U.S. Dep't of Educ.*, 752 F. Supp. 2d 30, 37 (D.D.C. 2010) (requests for current medical information are not adverse actions), *aff'd*, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011).  The plaintiff has offered no evidence that would allow a reasonable factfinder to conclude that Ms. Hontz's

requests for certain documents on a single occasion had any effect on the plaintiff that might dissuade a reasonable employee from making or supporting a charge of discrimination.

The criticism of the plaintiff's job performance itself, delivered by Mr. Loines and Mr. George in the February 4, 2009 conference call, also does not qualify as an adverse employment action.[23]  Employers are generally able to provide constructive criticism of their employees without running afoul of Title VII.  *See Baloch*, 550 F.3d at 1199 (letter of reprimand was not adverse employment action where it "contained no abusive language, but rather job-related constructive criticism, which can prompt an employee to improve her performance" (internal quotation marks omitted)); *Rattigan*, 604 F. Supp. 2d at 49 ("An employer should be entitled to discuss and even critique employees about legitimate job performance problems without being subjected to suit, because Title VII's anti-retaliation provision was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." (citations and internal quotation marks omitted)).  The D.C. Circuit has held that mere criticism of an employee's performance does not amount to an adverse employment action unless it is connected with a tangible harm. *Compare Kline v. Berry*, 404 F. App'x 505, 506 (D.C. Cir. 2010) (holding that "an e-mail from [the plaintiff's] boss criticizing her work" is not adverse action), *and Taylor*, 571 F.3d at 1321 (holding that "criticiz[ing] [the plaintiff] for exhibiting 'negative behaviors'" was not adverse employment action (citing *Burlington Northern*, 548 U.S. at 68)), *with Porter*, 606 F.3d at 818 (finding adverse employment action where criticism was placed in plaintiff's personnel file and "could expose him to removal, reduction in grade, withholding of within grade increase or reassignment").  The plaintiff does not argue that the criticisms leveled by Ms. Hontz or other

---

[23] To the extent that the e-mails between Ms. Hontz and Messrs. George and Loines could be considered criticism through "written memoranda," the criticism was not an adverse employment action either because the e-mails were not placed in the plaintiff's personnel file or otherwise retained in a way that could affect the plaintiff's "position, grade level, salary, or promotion opportunities."  *See Porter v. Shah*, 606 F.3d 809, 818 (D.C. Cir. 2010) (internal quotation marks omitted).

supervisors produced (or could have produced) any tangible injury or harm, and therefore they do not qualify as adverse employment actions for purposes of Title VII.

Finally, the incident at the SBA conference also does not constitute an adverse employment action.  Although the event described by the plaintiff—Ms. Hontz standing up and "shout[ing] at [the plaintiff] to sit down before he had completed his presentation," Pl.'s Opp'n at 11–12—was undoubtedly embarrassing for the plaintiff, a single embarrassing incident like this is not materially adverse.  The Supreme Court made clear in *Burlington Northern* that "petty slights, minor annoyances, and simple lack of good manners" will not deter reasonable employees from making or supporting claims of discrimination.  *Burlington Northern*, 548 U.S. at 68.  This is not to say that the plaintiff is wholly unwarranted in feeling slighted, embarrassed, or humiliated by Ms. Hontz's public actions, nor is it to say that, had this behavior been more persistent, or even had it happened on multiple occasions, it could not qualify as an adverse employment action.  Rather, the Court holds that this particular incident, within the context of this case, is not an adverse employment action because "[p]urely subjective perceptions of stigma or loss of reputation" do not constitute adverse action under Title VII.  *Rattigan*, 604 F. Supp. 2d at 51.

One last argument made by the plaintiff also deserves a final point of discussion.  The plaintiff argues that "[w]here, as here, there is a continuous pattern of retaliatory conduct, the conduct must be evaluated as a whole."  Pl.'s Opp'n at 13.  He goes on to argue that his retaliation claim is not necessarily premised upon any one discrete incident, but rather "[i]t is all the circumstances surrounding the interim assessment, the two day fishing expedition followed by the assertion of fabricated deficiencies which were objectively baseless, which meet the *Burlington* standard."  *Id.* at 14.

The plaintiff is correct that a handful of cases from within this Circuit have recognized that "a series of independent actions taken together, none of which would be considered an adverse employment action alone, can constitute an adverse employment action" in totality. *Turner v. Shinseki*, 824 F. Supp. 2d 99, 114–15 (D.D.C. 2011); *see also Dorns v. Geithner*, 692 F. Supp. 2d 119, 134 (D.D.C. 2010); *Baloch v. Norton*, 517 F. Supp. 2d 345, 362–63 (D.D.C. 2007). None of these cases, however, has actually recognized a situation where a series of non-adverse employment actions qualified as an adverse employment action when aggregated. In fact, the court in *Norton* recognized that there are "a number of difficulties" in proving what that court termed an "incidents-collectively-viewed retaliation claim." *Norton*, 517 F. Supp. 2d at 362. First, it is often difficult to distinguish between such an "incidents-collectively-viewed retaliation claim" and a hostile work environment claim. *See* discussion *supra* pages 17–19. The *Norton* court also held that the plaintiff had not explained "how viewing the incident collectively establishes any element of retaliation to greater effect than viewing them separately." *Norton*, 517 F. Supp. 2d at 362. In other words, the court was unable to "discern a collective retaliation claim greater than the sum of its parts," *id.* at 363, and the Court is presented with the same shortcoming in the instant case.

The plaintiff vaguely explains that the discrete employment actions discussed above collectively constitute an adverse employment action because they were "a full scale attack on [the plaintiff] personally and designed to destroy his SBA career" and that, as a result, "he has had difficulty sleeping at night and worried constantly about his career and future with SBA." Pl.'s Opp'n at 10; Pl.'s SMF at 19–20. Notably, however, the plaintiff has presented no evidence that would raise an *objective* factual question about whether the defendant's collective actions could have threatened or might continue to threaten his career. His arguments are confined to his own subjective fears and perceptions about his job security. Yet, courts have consistently

recognized that there is a difference between being "dissatisfied with [one's] work environment" or being subject to "bad management practice," on the one hand, *see Brodetski v. Duffey*, 199 F.R.D. 14, 21 (D.D.C. 2001), and, on the other hand, "the type of constant, pervasive oversight of any employee's performance identified by a proactive search for minor infractions as pretext for retaliatory harassment," *see Norton*, 517 F. Supp. 2d at 363.  It is also true that, although a plaintiff might "fear that his 'career goals' may be in jeopardy," that fear is insufficient to constitute an adverse employment action unless the plaintiff can "point[] to . . . objective evidence that such a fear had a basis in fact."  *Rattigan*, 604 F. Supp. 2d at 51.  The plaintiff has failed to create a genuine issue of material fact regarding whether aggregating the alleged employment actions of the defendant add up to "a collective retaliation claim greater than the sum of its parts."  *Norton*, 517 F. Supp. 2d at 363.  Thus, regardless of whether a plaintiff can claim an "incidents-collectively-viewed retaliation claim" in this Circuit, the plaintiff has failed to do so in the instant case.

## IV.   CONCLUSION

For the reasons stated above, the plaintiff's Request for Hearing, ECF No. 20, and Motion to Strike Defendant's Reply Brief and Statement of Material Facts in Dispute, ECF No. 22, are DENIED, and the defendant's Motion for Summary Judgment, ECF No. 14, is GRANTED.  An appropriate Order shall accompany this Memorandum Opinion.


**DATE**:  September 24, 2012


                                    /s/ *Beryl A. Howell*
                                    BERYL A. HOWELL
                                    United States District Judge